1  FRANK N. DARRAS #128904, Frank@DarrasLaw.com
2  SUSAN B. GRABARSKY #203004, SGrabarsky@DarrasLaw.com
   PHILLIP S. BATHER #273236, PBather@DarrasLaw.com
3  DarrasLaw
4  3257 East Guasti Road, Suite 300
5  Ontario, California 91761-1227
   Telephone: (909) 390-3770
6  Facsimile: (909) 974-2121

7  Attorneys for Plaintiff
8  JULIEANN SYLVESTER

9              UNITED STATES DISTRICT COURT
10             CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIEANN SYLVESTER,<br><br>Plaintiff,<br><br>vs.<br><br>THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,<br><br>Defendant. | Case No:<br><br>COMPLAINT FOR BENEFITS UNDER AN EMPLOYEE WELFARE BENEFIT PLAN |

Plaintiff alleges as follows:

1. This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1337 and 29 U.S.C. § 1132(a), (e), (f), and (g), of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101, *et seq.* (hereafter "ERISA") as it involves a claim by Plaintiff for Disability benefits under an employee benefit plan regulated and governed under ERISA. Jurisdiction is predicated under these code sections as well as 28 U.S.C. § 1331, as this action involves a federal question.

2. The ERISA statute, at 29 U.S.C. § 1133, as well as Department of Labor regulations, at 29 C.F.R. § 2560.503-1, provide a mechanism for administrative internal appeal of benefits denials. In this case, those avenues of appeal have been exhausted

and this matter is now properly before this court for judicial review.

3. The events or omissions giving rise to Plaintiff's claim occurred in this judicial district, thus venue is proper here pursuant to 28 U.S.C. § 1391(b)(2), and the ends of justice so require.

4. Plaintiff is informed and believes and thereon alleges that the Keycorp Long-Term Disability Plan ("Plan") is an employee welfare benefit plan established and maintained by KeyCorp, which is the Plan Administrator, to provide its employees and those of its subsidiaries and affiliates, including Plaintiff, JULIEANN SYLVESTER ("Ms. Sylvester"), with income protection in the event of a disability.

5. Plaintiff alleges upon information and belief that Defendant, THE PRUDENTIAL INSURANCE COMPANY OF AMERICA ("PRUDENTIAL"), is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of New Jersey, authorized to transact and transacting the business of insurance in this state, and, the insurer and Claims Administrator for the Plan.

6. Plaintiff further alleges that venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) in that Defendant PRUDENTIAL, which fully insured the policy and which is ultimately liable if Plaintiff is found disabled, may be found in this district. Since on or about May 13, 1901, PRUDENTIAL has been registered as a corporation with the state of California, has extensive contacts within the state, employs California residents, conducts ongoing business within the state and therefore, may be found within the state.

7. At all relevant times Plaintiff was a resident of the United States, an employee of KeyCorp, its successors, affiliates and/or subsidiaries, and a participant in the Plan.

8. Based upon information and belief, Plaintiff alleges that at all relevant times herein Plaintiff was covered under group disability policy number G-43748-OH (the "Policy") that had been issued by Defendant PRUDENTIAL to KeyCorp to insure its Plan, and the eligible participants and beneficiaries of the Plan, including Plaintiff.

9. Based upon information and belief, Plaintiff alleges that the subject Policy

promised to pay Plaintiff monthly long term disability benefits for a specified period of time should she become disabled. Therefore, PRUDENTIAL both funds and decides whether claimants will receive benefits under the Plan and as such suffers from a structural conflict which requires additional skepticism.

10. Based upon information and belief, Plaintiff alleges that, according to the terms of the Plan, if Plaintiff became disabled, PRUDENTIAL promised to pay long term disability benefits to Plaintiff as follows:

- "You are disabled when Prudential determines that:
  - you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
  - you are under the regular care of a doctor; and
  - you have a 20% or more loss in your earnings due to that sickness or injury."
- "After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury:
  - you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience; and
  - you are under the regular care of a doctor."
- Elimination Period: 180 days
- Monthly Benefit: 60% of your monthly earnings, but not more than the Maximum Monthly Benefit.
- Maximum Monthly Benefit: $20,000.00.
- Maximum Period of Benefits: Normal Retirement Age, age 67

11. Prior to her disability, Plaintiff was employed as Branch Manager for KeyCorp.

12. Plaintiff became totally disabled on or about December 22, 2017.

13. Despite undergoing multi-level spinal surgery, repeated injection

procedures, placement of a Spinal Cord Stimulator implant, and both conservative and aggressive pain management, she remains totally disabled from her occupation, and any other occupation, through the present.

14. On or about April 6, 2016, well before Ms. Sylvester became disabled, she sought treatment with Danielle Swiderksi, FNP ("Nurse Practitioner Swiderski") for neck and back pain radiating down her back and shoulders resulting in headaches. Ms. Sylvester's pain was of such severity she could not work that day. Examination revealed abnormal bicep reflexes, tenderness at the cervical spine, as well as decreased range of motion at the cervical spine. X-rays of the cervical spine revealed osteopenia; degenerative changes with degenerative bony endplate change and grade I spondylolisthesis at C3-4 and C4-5 with bilateral neural foraminal stenosis; degenerative disc changes with degenerative bony endplate changes at C5-6; reversal of the cervical lordosis centered at the C4 level with mid cervical dextro-flexion; and diffuse uncovertebral and facet joint hypertrophy. Ms. Sylvester was referred to physical therapy and prescribed Cyclobenzaprine.

15. On or about May 16, 2016, Ms. Sylvester returned to Nurse Practitioner Swiderski for ongoing neck pain now radiating to the front of her neck. Unfortunately, physical therapy had only worsened her pain. Ms. Sylvester's examination revealed tenderness over C3-4 and C4-5, tenderness at the right trapezius, very limited range of motion, and increased pain with right lateral turn. Cervical radiculopathy was assessed and physical therapy was put on hold for lack of efficacy.

16. On or about May 24, 2016, Ms. Sylvester's MRI of the cervical spine revealed multilevel cervical spondylosis most marked with moderate severe right foraminal narrowing at C2-3, moderate severe right facet arthropathy at C2-3, and loss of lordosis with multilevel anteroretrolisthesis scoliosis.

17. On or about June 16, 2016, Ms. Sylvester presented to Board Certified Pain Management Specialist Ivan Antonevich, MD ("Dr. Antonevich") for right-sided neck pain radiating to the right shoulder. Physically, Ms. Sylvester exhibited tenderness

at the right cervical paraspinals and upper trapezius. Ms. Sylvester was started on Zanaflax and scheduled for a right cervical facet injection.

18. On or about June 30, 2016, Ms. Sylvester underwent right C2-3, C3-4, C4-5, C5-6, C6-7 intra-articular facet joint blocks, administered by Dr. Antonevich.

19. On or about July 15, 2016, Ms. Sylvester presented to Dr. Antonevich for right-sided neck pain radiating into the shoulder. Ms. Sylvester's examination revealed tenderness of the right cervical paraspinals, moderate tenderness of the right upper trapezius; and painful extension and lateral flexion of the cervical spine. Ms. Sylvester was advised to continue Zanaflex with an increase to twice per day. A series of cervical epidural steroid injections would be scheduled.

20. On or about July 20, 2016, Dr. Antonevich performed C7-T2 interlaminar epidural steroid injections.

21. On or about August 2, 2016, Dr. Antonevich performed Ms. Sylvester's second round of C7-T2 interlaminar epidural steroid injections.

22. On or about August 16, 2016, Dr. Antonevich performed Ms. Sylvester's third round of C7-T2 interlaminar epidural steroid injections.

23. On or about August 8, 2017, Ms. Sylvester presented to Board Certified Internist Patrick Riccardi, MD ("Dr. Riccardi") for joint pain and stiffness. Ms. Sylvester's physical examination revealed tenderness at the cervical, thoracic, and lumbar spine, bilateral hand tenderness; and tenderness at the 1st bilateral fingers. Ms. Sylvester was prescribed Tizanidine.

24. On or about October 24, 2017, Ms. Sylvester reported left hand pain at the base of her thumb shooting up near her wrist and forearm. She continued to have right-side headaches. Ms. Sylvester's left hand x-ray revealed osteopenia and degenerative bony changes. She was advised to continue Celebrex and to try Tylenol arthritis.

25. On or about December 22, 2017, Ms. Sylvester ceased work altogether as a result of her debilitating impairments.

26. On or about December 26, 2017, Ms. Sylvester was seen by Dr. Riccardi, for neck pain, back pain, and osteoarthritis. Dr. Riccardi stated, "The patient has a history of significant osteoarthritis and multilevel degenerative disc disease making it very difficult for her to perform her activities of daily living." She was advised to split her Celebrex to twice per day for "more round-the-clock coverage" and her Tizanidine was renewed.

27. On or about February 20, 2018, Ms. Sylvester's pain continued to preclude her from performing even simple, everyday tasks. Ms. Sylvester's physical examination revealed tenderness at the cervical, thoracic, and lumbar spine, bilateral elbow tenderness, bilateral hand tenderness; painful range of motion at the bilateral hips. Dr. Riccardi referred to Ms. Sylvester's condition as "multifactorial noninflammatory chronic pain, related to developing degenerative disc disease, significant osteoarthritis."

28. On or about March 19, 2018, Ms. Sylvester bravely attempted to return to work. Unfortunately, her symptoms progressed. She again ceased work on April 16, 2018.

29. On or about April 22, 2018, an MRI of Ms. Sylvester's lumbar spine revealed a broad based disc bulge at L4-5 with paracentral left lateral disc herniation. There was a mass effect upon L5 in the foramen with moderate spinal canal stenosis; L5-S1 showed a central paracentral disc herniation at L5-S1 with flattening of the undersurface of the left L5 in the foramen on the left.

30. On or about May 14, 2018, Ms. Sylvester presented to Alexander Carangelo, PAC ("Physician Assistant Carangelo") at CNY Brain and Spine Neurology for back pain with radicular pain to her lower extremities. On examination, Ms. Sylvester's straight leg raise test was positive (+SLR) and she had an antalgic gait. Lumbar spondylosis with radiculopathy, lumbar disc degeneration, and lumbar spondylolisthesis were assessed. She was placed on Mobic.

31. On or about May 15, 2018, Ms. Sylvester's lumbar x-rays revealed L4-5 anterolisthesis 7-8mm, worse with flexion and extension, in addition to scoliosis.

32. On or about October 10, 2018, Ms. Sylvester saw Brittany L. Houseman, PAC and reported left hand pain and tenderness over the basal joint. She also exhibited a positive grind test. X-rays revealed narrowing of the joint space of the trapeziometacarpal joint. She was diagnosed with left thumb basal joint arthritis. She was given a push brace and Voltaren gel.

33. On or about February 15, 2019, Ms. Sylvester visited Board Certified Orthopedic Surgeon David Patalino, MD ("Dr. Patalino") and reported ongoing left thumb pain despite a cortisone injection and bracing. She was unable to push, pull, grab, or twist anything without significant pain. Examination revealed marked tenderness over the dorsal and volar aspect of the CMC joint as well as painful range of motion at the CMC joint. Dr. Patalino stated Ms. Sylvester "has debilitating left thumb pain secondary to CMC degenerative joint disease."

34. On or about March 25, 2019, Ms. Sylvester underwent left thumb CMC suspension arthroplasty, performed by Dr. Patalino.

35. On or about May 31, 2019, Ms. Sylvester presented to Physician Assistant Carangelo for worsening lumbar pain radiating on the right. By that point, the pain had progressed to the left leg as well. She again exhibited a positive straight leg raise test (+SLR). A right L4-5 epidural steroid injection was recommended.

36. On or about June 26, 2019, Ms. Sylvester visited podiatry specialist Joseph Mungari, DPM ("Dr. Mongari") for pain in the first metatarsal phalangeal joint bilaterally. X-rays revealed decreased joint space and dorsal spurring. Dr. Mungari discussed bilateral surgical intervention. Ms. Sylvester elected to proceed.

37. On or about June 27, 2019, Ms. Sylvester underwent right L4-5 epidural steroid injection, performed by Board Certified Neurosurgeon Nicholas Qandah, DO ("Dr. Qandah").

38. On or about July 12, 2019, Ms. Sylvester continued to experience left-sided back pain. Her gait remained antalgic. As such, a left L4-5 facet injection was recommended by Physician Assistant Carangelo.

39. On or about July 19, 2019, Ms. Sylvester underwent a left L4-5 facet injection, performed by Dr. Qandah.

40. On or about August 28, 2019, Ms. Sylvester underwent first metatarsal phalangeal joint replacement of the left foot, performed by Dr. Mungari.

41. On or about September 12, 2019, Ms. Sylvester returned to Dr. Qandah. Unfortunately, she had not received relief from her left-sided facet injection. Dr. Qandah assessed neurogenic claudication with numbness radiating into her feet bilaterally.

42. On November 22, 2019, Ms. Sylvester underwent first metatarsal joint replacement of the right foot, performed by Dr. Mungari.

43. On or about December 2, 2019, Ms. Sylvester returned to Dr. Qandah for pain management. She continued to walk with an antalgic gait.

44. On or about January 14, 2020, x-rays of Ms. Sylvester's lumbar spine showed anterolisthesis of L4 on L5.

45. On or about January 27, 2020, Ms. Sylvester returned to PA Carangelo for high-grade 1 spondylolisthesis. She continued to walk with an antalgic gait. Dr. Qandah recommended core strengthening as well as pelvic stability.

46. On or about January 30, 2020, Ms. Sylvester reported to Jeffrey Slovich, PA-C ("Physician Assistant Slovich") with ongoing aches and pains throughout her body. Polyarthritis was assessed and Physician Assistant Slovich recommended Ms. Sylvester have a DexaScan performed. Ms. Sylvester's bone density examination revealed osteopenia in the hips.

47. On or about April 13, 2020, Dr. Qandah documented Ms. Sylvester had no relief after six weeks of physical therapy. In fact, Ms. Sylvester felt her pain had worsened. A left L4-5 epidural steroid injection was recommended by Dr. Qandah.

48. On or about May 1, 2020, Dr. Qandah recommended Ms. Sylvester undergo surgical intervention for her progressing lumbar pain. Specifically, Dr. Qandah recommended Posterior Lumbar Interbody Fusion (PLIF).

49. On or about May 8, 2020, an MRI of Ms. Sylvester's lumbar spine showed spondylosis with inflammatory osteoarthritis between the posterior articular surfaces and spinal stenosis at the L4-5 level.

50. On or about June 10, 2020, Ms. Sylvester underwent decompressive left laminectomy, foraminotomy, facetectomy at L4-5 with placement of pedicle screw fixation at L4-5 and posterior lateral fusion at L4-5, performed by Dr. Qandah.

51. On or about June 15, 2020, Ms. Sylvester continued to have lower back pain with radiculopathy down the anterior portion of the right lower extremity. Subsequently, Dr. Qandah ordered a CT of the lumbar spine.

52. On or about June 19, 2020, Ms. Sylvester's CT scan of the lumbar spine revealed a broad based disc protrusion at L4-5 causing central lateral recess and bilateral foraminal stenosis in addition to severe facet arthritis.

53. On or about August 3, 2020, Ms. Sylvester reported frequent muscle spasms in the right lower back with radiculopathy to the right leg. She exhibited pain to palpation over the right side of the lower lumbar spine and an antalgic gait. Additional physical therapy was ordered.

54. On or about August 19, 2020, Ms. Sylvester presented to Kevin Gehr, MS, PAC ("Physician Assistant Gehr") with continued pain radiating to the right hip. An L4-5 facet injection was recommended.

55. On or about August 27, 2020, Ms. Sylvester participated in physical therapy in an attempt to alleviate her longstanding lower back pain.

56. On or about September 9, 2020, Dr. Qandah completed a Capacity Questionnaire for PRUDENTIAL and opined Ms. Sylvester does not have full-time work capacity.

57. On or about September 10, 2020, Dr. Qandah administered Ms. Sylvester's lumbar facet injection at L4-5.

58. On or about September 30, 2020, Ms. Sylvester stated her recent facet injection provided partial relief for two short days. Dr. Qandah recommended a right L4-5 medial branch block in addition to Lidoderm patches

59. On or about October 2, 2020, Ms. Sylvester underwent a trigger point injection as the right L4-5 medial branch block had yet to be approved by Ms. Sylvester's insurance.

60. On or about November 13, 2020, Ms. Sylvester continued to await approval for the recommended right L4-5 medial branch block. Unfortunately, her recent trigger point injection provided just five days of relief.

61. On or about November 23, 2020, PRUDENTIAL unreasonably and unlawfully denied Ms. Sylvester's benefits effective December 1, 2020.

62. On or about January 2, 2021, Ms. Sylvester underwent a right L4-5 lumbar facet injection.

63. On or about January 2, 2021, Ms. Sylvester appealed PRUDENTIAL's decision.

64. On or about January 27, 2021, Ms. Sylvester presented to Board Certified Neurosurgeon Victor Udekwu, MD. ("Dr. Udekwu"). She had received very little benefit from the recent injection. Dr. Udekwu recommended Ms. Sylvester participate in home exercises and formal physical therapy.

65. On or about February 6, 2021, Ms. Sylvester restarted physical therapy. She exhibited limited range of motion with lumbar extension and marked tension on the right lumbar paraspinals and moderate tension on the left.

66. On or about March 17, 2021, Ms. Sylvester visited Physician Assistant Carangelo as her lower back pain remained. She also had worsening axial neck pain radiating to the right trapezius and right scapular region. At that point, Ms. Sylvester had failed conservative measures for her cervical pain including Celebrex, Flexeril, and

physical therapy. An updated cervical MRI was ordered. For her lumbar pain, a repeat L4-5 medical branch block was recommended.

67. On or about April 21, 2021, an MRI of the cervical spine showed right sided C3-4 neural foraminal stenosis.

68. On or about April 23, 2021, Ms. Sylvester exhibited tenderness over the right S1 joint. She continued to suffer from radiating lower back pain and a dull ache in her neck.

69. On or about April 29, 2021, Dr. Qandah performed a right lumbar facet injection at L4-5.

70. On or about May 13, 2021, Ms. Sylvester reported the facet injection only provided 30% relief and she continued to have lower back pain radiating to the right extremity along with numbness and muscle spasms.

71. On or about May 21, 2021, Dr. Qandah stated Ms. Sylvester cannot perform lifting, bending, twisting, and cannot lift more than five pounds. He also stated she cannot return to full-time work in a sedentary capacity. Dr. Qandah specified "Patient with chronic lower back pain and cervical pain. She is unable to sit for prolonged amount of times. Patient with both lower and upper extremity weakness and numbness…experiences neuroclaudication symptoms."

72. On or about June 28, 2021, PRUDENTIAL unreasonably and unlawfully upheld its decision to deny Ms. Sylvester's benefits.

73. On or about July 15, 2021, Mr. Sylvester participated in a Functional Capacity Evaluation (FCE) with Craig Peterson, PT ("Physical Therapist Peterson"). After thorough testing, Physical Therapist Peterson concluded Ms. Sylvester does not qualify for sedentary work and is therefore unable to work.

74. On or about August 24, 2021, Ms. Sylvester returned to Physician Assistant Gehr. In light of Ms. Sylvester's intractable pain, Physician Assistant Gehr recommended Ms. Sylvester undergo a Spinal Cord Stimulator implant trial.

75. On or about August 24, 2021, Dr. Qandah had the opportunity to review Ms. Sylvester's Functional Capacity Evaluation. Dr. Qandah agreed Ms. Sylvester does not qualify for sedentary work and is therefore unable to work.

76. On or about October 15, 2021, Ms. Sylvester appealed PRUDENTIAL's denial with assistance from counsel.

77. On or about November 11, 2021, Ms. Sylvester underwent Spinal Cord Stimulator trial placement by Dr. Qandah.

78. On or about January 18, 2022, Ms. Sylvester underwent permanent placement of the Spinal Cord Stimulator implant.

79. On or about January 25, 2022, Ms. Sylvester continued to have radicular pain in her lower extremities, the right greater than the left.

80. On or about January 28, 2022, with assistance from counsel, Ms. Sylvester responded to PRUDENTIAL's medical reviews completed by Joe Ordia, MD and E. Franklin Livingston, MD.

81. On or about March 28, 2022, Physical Therapist Peterson stated:

> "In reviewing the FCE, the data supports the classification of unable to work. The FCE performed with Ms. Sylvester is a data collection tool of objective information. This information forms the basis for categorizing an individual in regards to their functional abilities. Specifically, the finding of 'very poor' strength is determined via the percentile profile…As such, these percentiles are objective test data collected during the exam. Ms. Sylveters [sic] results placed her in the 'very poor' category."

82. Despite all the additional medical information submitted by Ms. Sylvester as part of her appeal, on or about May 12, 2022, PRUDENTIAL unreasonably and unlawful upheld its denial of Ms. Sylvester's Long Term Disability benefits.

83. Based upon the substantial medical evidence in the possession of PRUDENTIAL at the time of the denial, its decision to deny disability insurance benefits was wrongful and contrary to the terms of the Plan.

84. Additionally, ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator "discharge [its] duties" in respect to discretionary claims processing "solely in the interests of the participants and beneficiaries" of the plan, 29 U.S.C. § 1104(a)(1); it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators "provide a 'full and fair review' of claim denials," *Firestone Tire & Rubber Co. v. Bruch,* 489 U. S. 101, 113 (1989) (quoting 29 U.S.C. § 1133(2)); and it supplements marketplace and regulatory controls with judicial review of individual claim denials, see 29 U.S.C. § 1132(a)(1)(B).

85. As a direct and proximate result of PRUDENTIAL's failure to provide Plaintiff with Plan benefits, Plaintiff has been deprived of said Plan benefits beginning on or about December 1, 2020, to the present date.

86. As a further direct and proximate result of the denial of benefits, Plaintiff has incurred attorney fees to pursue this action, and is entitled to have such fees paid by defendants pursuant to 29 U.S.C. § 1132(g)(1), ERISA § 502(g)(1).

87. A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan.  Plaintiff seeks the declaration of this Court that she meets the Plan definition of disability, was, and is, eligible for coverage, and consequently she is entitled to all benefits from the Plan to which she might be entitled while receiving disability benefits, with reimbursement of all expenses and premiums paid for such benefits from the termination of benefits to the present.  In the alternative, Plaintiff seeks a remand for a determination of Plaintiff's claims consistent with the terms of the Plan.

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1. An award of benefits in the amount not paid Plaintiff beginning on or about December 1, 2020, together with interest at the legal rate on each monthly payment from the date it became due until the date it is paid; plus all other benefits from the Plan to which she might be entitled while receiving disability benefits including, but not limited

to, any medical, vision, and dental benefits, life insurance and pension, with reimbursement of all expenses and premiums paid for such benefits or, in the alternative, a remand for a determination of Plaintiff's claim consistent with the terms of the Plan;

    2.    An order determining Plaintiff was, and is, eligible for coverage, and is entitled to future Plan benefits so long as she remains disabled as defined in the Plan;

    3.    For reasonable attorney fees incurred in this action; and,

    4.    For such other and further relief as the Court deems just and proper.

Dated: July 6, 2022

DarrasLaw

_/s/_____
FRANK N. DARRAS
SUSAN B. GRABARSKY
PHILLIP S. BATHER
Attorneys for Plaintiff
JULIEANN SYLVESTER